(No. 34503.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS E. HAYES, Plaintiff in Error.

*Opinion filed Nov. 20, 1957—Rehearing denied Jan. 20, 1958.*

JOSEPH KEIG, SR., and JOHN O'C. FITZGERALD, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, BRUCE E. KAUFMAN, L. LOUIS KARTON, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

Plaintiff in error, hereinafter referred to as the defendant, was indicted, tried and convicted of the crime of assault with a deadly weapon in the criminal court of Cook County and sentenced to the county jail for a term of six months. The trial was by the court, defendant having waived a trial

by jury. He sued out·a writ of error from the Appellate Court for the First District to review the judgment and sentence imposed and that court affirmed the judgment. (13 Ill. App.2d 256.) Seeking a further review of his case defendant sued out a writ of error from this court. Here he contends that upon the record a reasonable doubt of his guilt exists and, therefore, it is our duty to reverse the judgment of conviction, notwithstanding that the trial court heard and saw the witnesses. To determine whether such a reasonable doubt does exist in this case it is necessary for us to review the evidence in the record.

The complaining witness, Mrs. Mary D. Kelly, testified that while she was in McPartlan's Tavern in Chicago she was introduced to the defendant, a police officer, by a friend of hers, John Green, also a police officer; that after visiting there with them awhile, she and the defendant, together with officer Green, McPartlan, his wife, and a man named Garrity, went to the Hickory Pit, a restaurant located near the tavern. There they all sat in a booth, conversed and ate. Mrs. Kelly then put in a take-out order of chicken for her father who was home baby-sitting with her children. After that all of the group left except Mrs. Kelly and the defendant who were waiting for the order of chicken to be prepared. Before leaving, officer Green asked the defendant if he would see Mrs. Kelly home. He said he would. It was then between 5 and 6 o'clock in the morning. When the chicken was ready she and defendant left the Hickory Pit and started for his car.

She testified further that after defendant entered the car he attempted to kiss her, whereupon she placed her hand under his chin and pushed him back; that defendant put his hand in the back of the seat and then she felt two knocks on her head and again on her side and as she looked up she saw a blackjack in defendant's right hand which he was slamming down on her. She was struck on the head seven or eight times. She then managed to push the door handle

down and rolled out of the car to the edge of the sidewalk. Defendant then drove away, but while she was on her hands and knees she took note of his license number. A passer-by stopped, picked her up and drove her to the Summerdale police station, where she reported the incident. From there she was taken in a squadrol car to the hospital where X rays were taken and her injuries treated.

It was stipulated that the diagnosis made by Dr. Oden, after an examination of Mrs. Kelly, would show a mild cerebral concussion, multiple scalp lacerations and hematoma on dorsal aspect of right forearm, involving extensor tendon of the right hand.

Except that there were no eyewitnesses to the assault the record is replete with corroborative evidence in support of the People's case. The witness Yokas, who saw Mrs. Kelly on the sidewalk and later drove her to the police station testified that she was bleeding about her forehead. Desk sergeant Shea, at the police station, noticed Mrs. Kelly was bleeding from the top of her head when she was there to report the incident. Later that morning Shea and another officer, after receiving from defendant his car keys, inspected and examined the car and found inside that the passenger side in front was stained with blood and alongside of the passenger seat and the front door on the right side they found Mrs. Kelly's pocketbook. In it was her driver's license and over $45 in currency. The evidence shows that a coat and sweater she wore that morning contained blood stains, which were not there before the assault took place.

The defendant testified in his own behalf. He admitted meeting Mrs. Kelly at McPartlan's Tavern on the occasion in question, the introduction to her by his fellow officer, John Green, the trip of the group to the Hickory Pit, the request of officer Green to defendant to see Mrs. Kelly home, the departure of the group, except Mrs. Kelly and defendant, from the Pit. As to the incident in question,

defendant testified as follows: "I opened the door (of his car) to allow Mrs. Kelly to enter and I turned and went around to the other side to get in the car. Before I could get in the car, she jumped out. * * * When she went out of the car I drove away, started the engine and drove away. * * * Later I went home." He denied striking Mrs. Kelly and that he owned a blackjack.

The record shows, however, that the defendant, out of court, made statements concerning the event wholly inconsistent with his testimony on the witness stand. Notwithstanding his admission on the trial that he met Mrs. Kelly that evening, he denied to his superior officer that he knew her or had been in McPartlan's Tavern with her or had been in the Hickory Pit. As to the blood stains on the car seat he first told his commanding officer it was from a scratch on the side of his face and on his knuckle, but on the trial he said it was from a bloody nose occasioned by an automobile accident. Thus it appears that the defendant contradicted himself as well as being contradicted by Mrs. Kelly. In these circumstances it was the well-established prerogative of the trial court, sitting as the trier of the facts, to determine whether or not the defendant was a credible witness. We can find nothing in this record which would warrant us in disturbing its conclusion that his version was not worthy of belief.

During the trial, the court said, in questioning the prosecuting witness, "I can't understand that violence,' and afterwards, upon denying the petition of defendant for release on probation, the court said "I would like to know the true facts in this case." Defendant argues that this indicates the court entertained a reasonable doubt of defendant's guilt. There is no merit to this contention when all of the remarks of the court are taken into consideration, in context. This is what the court said: "I would like to know the true facts in this case. It might mean that I would impose a heavier sentence than I have in mind, or it might

mean I would impose a lighter sentence. Whether you know it or not, the evidence shows that you brutally assaulted her. * * * My mind hasn't changed any materially since. * * * But I do believe the complaining witness's story that there was an assault. * * * However, regardless of the provocation, an assault by a Police Officer on a defenseless female is serious enough. * * * The sentence I had in mind at the time which I wrote down in my book was six months in the County Jail. That will be the sentence."

It is obvious from said remarks that it cannot be said the trial court entertained a reasonable doubt of defendant's guilt, especially in the light of all the evidence in the record.

From an examination of the record we conclude that defendant's guilt in this cause has been established beyond a reasonable doubt and therefore the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*